**Marvin BRENER, Plaintiff-Appellant,**

v.

**DIAGNOSTIC CENTER HOSPITAL, Defendant-Appellee.**

No. 81–2030.

United States Court of Appeals, Fifth Circuit.

March 22, 1982.

---

Nelkin & Nelkin, Carol Nelkin, Joel Jay Reinfeld, Houston, Tex., for plaintiff-appellant.

Ford, Harrison, Sullivan, Lowry & Sykes, Ronald R. Kimzey, Atlanta, Ga., for defendant-appellee.

Before DYER *, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

DYER, Senior Circuit Judge:

Brener, an Orthodox Jew, brought an action in the district court claiming that he

---

* Circuit Judge of the Eleventh Circuit, sitting by designation.

was discharged by his employer, the Diagnostic Center Hospital because of his religion. The district court finding that the measures implemented by the hospital satisfied its burden of showing reasonable accommodation and that further measures advocated by Brener would result in undue hardship entered judgment for the hospital. We affirm.

In 1972, Congress amended Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., in an attempt to clarify the Act's prohibition of religious discrimination in employment. Under the amendment, an employer commits an unfair employment practice if he discriminates against an employee because of any aspect of his "religious observance and practice" unless the employer meets the burden of showing "that he is unable to reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).[1] In this appeal we consider what measures an employer must implement to satisfy this burden.

Brener was hired as a staff pharmacist by the hospital in March of 1978. At that time, the hospital employed five staff pharmacists, plus the pharmacy director, Charles Luther. The pharmacy operated seven days per week. On each week day, four pharmacists were scheduled to report for eight hour shifts. The shifts began at seven, eight and nine a. m. and two p. m. One pharmacist manned the pharmacy on the weekends, working a 12-hour shift on Saturday and a 14-hour shift on Sunday. The shift assignments were allocated on a rotating basis. Consequently, each pharmacist was scheduled to work one out of five weekends. Although Luther established the hours that the pharmacy would remain open, the pharmacists met monthly to arrange their own work schedules. Once the schedule was settled, pharmacists desiring a change were allowed to trade shifts with other staff pharmacists.

Shortly after beginning work, Brener advised Luther that his faith prohibited him from working on the Sabbath (from sunset Friday to sunset Saturday). On the first Saturday on which Brener was scheduled to work, he approached Luther and sought a change of shifts. Contrary to his past policy of not interfering with the pharmacists' schedules, the director agreed to order a trade of schedules so Brener would not be required to work on that particular Saturday. He continued to direct trades for the next two or three Saturdays when Brener was scheduled to work. Thereafter, Brener arranged a trade with another pharmacist so that he worked on Sunday when scheduled for Saturday.

When Brener informed Luther that Jewish holy days of Rosh Hashanah and Yom Kippur fell on October 2, 3 and 11, Luther directed other pharmacists to trade the Christmas holidays with Brener for these days. Luther also began receiving complaints from the other pharmacists regarding the special treatment of Brener.

Brener made another request for a change later in October, explaining to Luther that he could not work on October 16, 17, 23 or 24 in observance of the Jewish holy day of Sukkos. Luther replied that due to the morale problem among the pharmacists he could not direct further scheduling exchanges, but that he would approve any exchanges arranged by Brener with other pharmacists. Brener failed to arrange an exchange of shifts, and did not appear for work as scheduled on October 16

1. 42 U.S.C. § 2000e(j) provides:

(j) The term "religion includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e–2(a)(1) provides, in pertinent part:

(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

and 17. When he returned to work on October 18, he was called into a meeting with Luther and the hospital's personnel director. During this meeting Brener tendered his resignation, but it was not immediately accepted by Luther. Luther informed Brener that he did not wish him to resign, but that he would not direct other pharmacists to exchange schedules with him on October 23 and 24. He reaffirmed his willingness to approve any trade Brener might obtain. No exchange of shifts was arranged, however, and Brener did not report for work on either day. Upon his return to work on October 25, Brener's resignation was accepted by Luther.

The district court found that Brener failed to avail himself fully of the hospital's flexible scheduling system. The court determined that Brener did not make a good faith effort to contact the full time pharmacists not scheduled for duty on October 16, 17, 23 and 24 to arrange trades on those days. The hospital's rotating shift scheduling system, the court found, would have accommodated Brener's needs if he had attempted to work within its confines. The court further found that the director had taken active steps to accommodate Brener by altering his long standing policy of not directing schedule trades and by establishing a flexible scheduling system. The court concluded that an employee has a duty to cooperate with an employer's efforts to reconcile his work schedule with the practice of his religion.

The effect of Brener's absence from work, the court found, was a decrease in efficiency and an increase in the burden on other pharmacists. The increased workload in turn resulted in a decline in the quality of patient care. Concluding that accommodating Brener outside the established scheduling system resulted in undue hardship on the hospital and Brener's co-workers, the court entered judgment for the hospital.

■ The hospital concedes that Brener had established a prima facie case of religious discrimination by demonstrating that he had a bona fide religious belief that conflicted with an employment requirement, that he informed his employer of this belief and that he was discharged for failing to comply with the conflicting employment requirement. *See Brown v. General Motors Corp.*, 601 F.2d 956, 959 (8th Cir. 1979); *Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, (9th Cir. 1978), *cert. denied sub nom., International Association of Machinists and Aerospace Workers of America v. Anderson*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *cf. Furnco Construction Co. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.") With a prima facie case established, the burden shifted to the hospital to show that it was unable to reasonably accommodate Brener's needs without undue hardship. 42 U.S.C. § 2000e(j).

The efforts undertaken by the hospital to accommodate Brener are similar to those instituted by the employer in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), the leading case construing § 2000e(j). The plaintiff in that case, Hardison, like Brener, could not work on Saturday because of religious belief. The Court concluded that his employer had engaged in significant efforts to accommodate his needs. First, in cooperation with the union, the airline had adopted a seniority system which minimized the number of occasions when an employee must work when he would prefer to attend to other needs. Second, the company reduced its weekend work force to the bare minimum needed to remain in operation.[2]

2. *Hardison* demonstrated that an employer's reasonable accommodation of an employee's religious observances need not be initiated in response to the employee's protest. The seniority system and weekend work crew policy were established before Hardison made known his difficulties. To the same effect is our decision in *Howard v. Haverty Furniture Co.*, 615 F.2d 203 (5th Cir. 1980) which found that an arrangement allowing employees to take time

Third, it pledged to approve any exchange of shifts for Hardison that could be arranged with the union. Fourth, it offered Hardison his holidays off if he would agree to work on the more common religious holidays. *Id.* at 77–78, 97 S.Ct. at 2273–74.

The district court in this case found that the hospital took active steps to accommodate Brener; in light of *Hardison*, we discern no clear error in this finding. Fed. R.Civ.P. 52(a). The rotating shift scheduling system adopted by the hospital provided for even greater flexibility than the seniority system established in *Hardison*. Tenure of service was not a factor in preparing the pharmacy schedule, which was arranged monthly by the employees themselves. Trading of schedules by pharmacists to satisfy individual needs was common and routinely approved. On weekends, the hospital required that only a single pharmacist report for duty. Like Hardison, Brener was offered an opportunity to work on the more typical religious holidays in exchange for his days of religious observance. The hospital, moreover, exceeded the efforts of Hardison's employer to accommodate his needs by deviating from established practice and experimenting with directing other employees to trade schedules with Brener. No such effort was made in *Hardison*.

Brener contends that the pharmacy's scheduling system was rendered inflexible by the reluctance of other employees to trade schedules with him. The district court found, however, that Brener made only haphazard efforts to arrange schedule trades. Brener waited until October 15 to approach the employee not scheduled for work on October 16 and 17 to discuss a trade. The court found that Brener did not contact the pharmacist off duty on October 23 and 24, the last two days of Sukkos. Brener's failure to appear for work on these days led to his firing. Supported by such evidence, the district court's finding that Brener did not cooperate with the hospital's effort to satisfy his needs within the established scheduling system is not clearly erroneous.

Although Title VII complainants are under no burden to propose to their employers specific means of accommodating their religious practices, *Redmond v. GAF Corp.*, 574 F.2d 897, 901 (7th Cir. 1978), their duty to cooperate with the measures suggested by their employers is well recognized. In *Chrysler Corp. v. Mann*, 561 F.2d 1282 (8th Cir. 1977) the employee refused to avail himself of his employer's leave of absence procedure or to use his paid excused absences to satisfy his religious needs. Instead, he failed to appear for work repeatedly because of religious observances, and ultimately was discharged. The court ruled that the firing was not unlawful, reasoning that the employee was responsible for the failure of accommodation. The court recognized the employee's duty, inherent in the employment relationship, "to attempt to accommodate his beliefs himself and to cooperate with attempts at reasonable accommodation by his employer." *Id.* at 1285. Similarly, in *Yott v. North American Rockwell Corp.*, 602 F.2d 904 (9th Cir. 1979), an employee who refused to pay union dues was offered the opportunity to contribute an equivalent sum to a charity of his choice, including his own church, but refused. Citing *Mann*, the court stated that in such circumstances, "accommodation does not appear possible." *Id.* at 908.

The situation in *United States v. City of Albuquerque*, 545 F.2d 110 (10th Cir. 1976) parallels the facts in this case. The employer's scheduling system permitted trading of shifts by employees, but the employee made no attempt to exchange shifts, choosing instead not to report for work. The court upheld the employee's subsequent discharge because he had declined to cooperate with the employer's efforts to accommodate him.

These cases confirm what the statute's use of the term "reasonable" suggests: bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the

---

off whenever they desired except at times of peak business demands was part of an effort to

reasonably accommodate the employee's needs.

exigencies of the employer's business. Although the statutory burden to accommodate rests with the employer, the employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer. A reasonable accommodation need not be on the employee's terms only.[3] Here, Brener did not fully explore the possibilities for accommodation within the pharmacy's flexible scheduling system before he sought additional action from the hospital. In such circumstances, he cannot reject the hospital's efforts as inadequate.

■ Brener argues that the district court erred in finding that further measures to accommodate him outside the pharmacy's scheduling system would result in "undue hardship" to the hospital and its employees. Providing the proper legal standard is applied, this finding is to be upheld unless clearly erroneous. *Howard v. Haverty Furniture Co., supra*, 615 F.2d at 206; *Yott v. North American Rockwell Corp., supra*, 602 F.2d at 908, *Redmond v. GAF Corp., supra*, 574 F.2d at 902–03.[4]

The Supreme Court concluded in *Hardison* that an employer suffers undue hardship when required to bear a greater than *de minimus* cost or imposition upon co-workers. *Id.* at 84, 97 S.Ct. at 2277; *Tooley v. Martin Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981); *Burns v. Southern Pacific Transportation Co.*, 589 F.2d 403, 406 (9th Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). As one court has explained, the "rationale underlying this determination is that anything more than a *de minimus* cost would result in discrimination against other employees, a result the Court concluded Congress did not

intend." *Nottleson v. Smith Steel Workers D. A. L. U. 19806*, 643 F.2d 445, 451 (7th Cir. 1981). Accordingly, the Supreme Court rejected Hardison's proposal that he be replaced on his holy days by supervisory personnel or that substitutes be obtained at premium wages. The Court also ruled that the employer need not deviate from its seniority system to afford an employee a shift preference for religious reasons:

> It would be anomalous to conclude that by "reasonable accommodation" Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.

*Id.* at 81, 97 S.Ct. at 2275.[5] Looking to Title VII's general policies and objectives, the Court concluded that employers were "not required to discriminate against some employees in order to enable others to observe the Sabbath." *Id.* at 85, 97 S.Ct. at 2277. Brener here proposed several alternatives to working on his day of religious observances, all of which are similar to the measures rejected in *Hardison*. The first of these options, hiring a substitute pharmacist, plainly would involve more than a *de minimus* cost.[6] The district court found that another proposed solution, having Luther substitute for Brener, resulted in decreased efficiency, economic loss, and increased risk to patients. A third suggestion, operating without Brener, also was found to have a detrimental impact on the pharmacy's function.

Brener's principal proposal, that Luther direct other employees to trade shifts with

---

3. Of course, an employee is not required to modify his religious beliefs, *Redmond v. GAF Corp., supra*, 574 F.2d at 901–902, only to attempt to satisfy them within the procedures offered by the employer.

4. Although the district court included its finding of undue hardship among its conclusions of law, the district court's label does not control the scope of our review. *See, e.g., East v. Romine, Inc.*, 518 F.2d 332, 338 (1975).

5. Brener argues that *Hardison* is distinguishable from this case because a collective bargaining agreement was involved, but the excerpt quoted above clearly indicates that the court's concern was not only with breach of the agreement but also with preferential treatment of some employees on the basis of religion.

6. Testimony in the record indicated that the minimum cost for hiring another pharmacist would have been approximately $14,000 per year.

him, also would inflict undue hardship upon the hospital and its employees. Luther's experiment with this solution resulted in disruption of work routines and a lowering of morale among the other pharmacists. Brener's characterization of complaints by others as mere grumbling underestimates the actual imposition on other employees in depriving them of their shift preference at least partly because they do not adhere to the same religion as Brener. *Trans World Airlines, Inc. v. Hardison, supra,* 432 U.S. at 81, 97 S.Ct. at 2277. The hospital is also harmed because its employees are compelled to accept less favorable working conditions. *See United States v. City of Albuquerque, supra,* 545 F.2d at 114. We find no clear error in the district court's determination that further accommodations would produce undue hardship.

AFFIRMED.